IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS

ROBERT J. MATHEWSON, JR.,

        Plaintiff,

    v.

CORE CIVIC CORPORATION (aka
CORRECTIONS CORPORATION OF
AMERICA), CHIEF BRENT MADRID,
LT. BUSHMAN-WEAVER, and KARI
ALSTEAD (aka KARI KENYON)

        Defendants.

CV 18-00059-GF-BMM-JTJ

ORDER AND FINDINGS AND
RECOMMENDATIONS OF UNITED
STATES MAGISTRATE JUDGE

Plaintiff Robert Mathewson, a prisoner proceeding without counsel, filed an Amended Complaint alleging that Defendants violated his rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA) 42 U.S.C. § 2000, et seq., the free exercise clause of the First Amendment, the equal protection and due process clauses of the Fourteenth Amendment, and several claims under the Montana Constitution.  (Doc. 48.)  Pending are Mr. Mathewson's Motion for Partial Summary Judgment (Doc. 76) and Motion to Stay (Doc. 89), Defendant Alstead's Motion for Summary Judgment (Doc. 82), and the Core Civic Defendants' Motion for Summary Judgment (Doc. 86).

The incident at issue in this case occurred on September 28, 2017 at Crossroads Correctional Center ("Crossroads") when during the process of a cell

1

search, Defendant Bushman-Weaver determined that Mr. Mathewson's Native American eagle prayer fan was constructed in violation of prison policy. Lt. Bushman-Weaver ordered Mr. Mathewson to dismantle the fan or receive a write-up and be placed in segregation. Mr. Mathewson became distraught at this instruction and broke the fan over his knee. He threw the fan handle at Lt. Bushman-Weaver but retained possession of the feathers which he subsequently burned.

The Court finds that it was not a statutory or constitutional violation to instruct Mr. Mathewson to bring his fan into compliance with a valid prison policy and as such Mr. Mathewson's motion for partial summary judgment should be denied, Defendants' Motions for Summary Judgment should be granted, and this matter should be dismissed.

## I. MOTION TO STRIKE

In support of their Motions for Summary Judgment, Defendants relied upon the affidavit of Mahpevanahane Lorne Bearcomesout (Doc. 84-1). Mr. Bearcomesout was a Pipeholder at Crossroads at the time of the incidents at issue in this lawsuit. Mr. Mathewson moves to strike Mr. Bearcomesout's affidavit because he claims did not obtain Mr. Bearcomesout's affidavit in discovery, Mr. Bearcomesout was not identified as a witness as required by Fed.R.Civ.P. 26(a), and the affidavit was given under duress. (Docs. 89, 94, 100.) The Court finds

that Mr. Mathewson disclosed Mr. Bearcomesout as a witness in his deposition, there is evidence that Defendants disclosed Mr. Bearcomesout as a witness during discovery, and that Defendants produced Mr. Bearcomesout's affidavit within days of it being signed.  The Court does not see a sufficient basis to strike Mr. Bearcomesout's affidavit.  However, given that there is sufficient evidence on which to find for Defendants without the affidavit and out of an abundance of caution, the Court has not considered Mr. Bearcomesout's testimony in its analysis.  Mr. Mathewson's motion is therefore moot.

## II.  MOTION FOR SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the

adverse party cannot produce admissible evidence to support the fact."
Fed.R.Civ.P. 56(c)(1)(A), (B).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed.R.Civ.P. 56(c)(1)(B). Summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

If the moving party meets its initial responsibility, the burden shifts to the opposing party to establish that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific

4

facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed.R.Civ.P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. "A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc). The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted).

By notices provided on November 22, 2019 (Docs. 85, 88), Mr. Mathewson

was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998)(en banc); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

## III. FACTS

On September 28, 2017, Plaintiff Robert J. Mathewson, Jr. was a state inmate incarcerated at Crossroads Correctional Center in Shelby, Montana. (Plaintiff's Statement of Undisputed Facts in Support of Partial Judgement Motion, Doc. 78 (hereinafter "Mathewson SUF") at ¶ 1, undisputed; Defendants' Joint Statement of Undisputed Facts, Doc. 84 (hereinafter "Defendants' SUF") at ¶ 52, undisputed.) Mr. Mathewson is an enrolled member of the Prairie Band Potawatomi Nation who had a Migratory Bird permit (MD# 02188c) from the United States Department of the Interior entitling him to possess the eagle feathers at issue for religious purposes. (Mathewson SUF at ¶ 2, undisputed.)

Over the course of a month in the fall and winter of 2016, while incarcerated, Mr. Mathewson constructed the prayer fan at issue according to instructions from his tribe and other elders. Mr. Mathewson testified that there are two options for constructing a prayer fan. One is a "drop fan" where each feather is individually beaded and wrapped in a leather loop so that the leather loop can be placed with string or more leather. The four feathers are then held by twisting the

leather tight into a fan to hold it.  (Mathewson Depo, Vol. I at 54:4-11, Doc. 84-17at 14.)  Mr. Mathewson, however, chose to construct a "fixed" prayer fan where there is a handle attached to the feathers.  Mr. Mathewson's prayer fan was made up of four feathers, two large ones and two small ones.  The two large feathers were the platform on which the two small feathers rested.  The feathers were glued and taped to a wooden dowel.  Leather was then glued and wrapped around the handle, and the side was sewn shut.  Then the leather handle was fully beaded from the hilt to the neck.  (Mathewson response to CoreCivic Defendants' First Discovery Requests, Interrogatory No. 6, Doc. 106-4 at 11.)

The construction of Mr. Mathewson's prayer fan made it a completed hobby item, which Mr. Mathewson was not allowed to keep in his cell pursuant to MSP 5.5.4 the Hobby Program Policy.  (Defendants' SUF at ¶ 61, undisputed.)  Mr. Mathewson never requested or was granted any special permissions to keep any hobby materials or a completed hobby item in his cell beyond standard policy. (Defendants' SUF at ¶ 64, undisputed.)  Mr. Mathewson testified that he ordered the dowel for his fan handle from the prison as hobby and it was given to him,[1] but it was not covered under any of his hobby permits.  (Mathewson Depo. Vol. II at 291:2-22, Doc. 80 at 67.)  On July 11, 2027, Mr. Mathewson obtained an art hobby

---

[1]Mr. Mathewson purchased three wooden dowels from the prison as hobby on November 4, 2016.  (Doc. 80 at 32.)

permit which did not allow for wooden dowels.  (Doc. 84-13 at 1.)

On September 28, 2017, Crossroads staff conducted a general search of inmate cells.  Lt. Bushman-Weaver conducted a search of Mr. Mathewson's cell during which she discovered Mr. Mathewson's prayer fan.  (Defendants' SUF at ¶ 68, undisputed.)  After the search Lt. Bushman-Weaver discussed Mr. Mathewson's eagle feather fan with him.  (Defendants' SUF at ¶ 72, undisputed.) There is some dispute, however, regarding what Lt. Bushman-Weaver precisely said to Mr. Mathewson regarding his fan.

In his informal grievance submitted the day of the incident, Mr. Mathewson stated,

> Today the Shelby Facility did some kind of search and officer Lt. Bushman forced me to destroy my spiritual medician [sic] fan for prayer.  She said I can destroy it take it all apart or go to the hole with a major right [sic] up.  I told her I have a federal permit to have the eagle fethers [sic] for my spiritual beleifs [sic] and she said she did not care take it all apart or go to the hole with a major right up.  So I broke it over my knee and gave her the handle and told her I'm keeping my feathers.  That its a federal crime for me to give the eagle feathers to anyone.

(September 28, 2017 Informal, Doc. 106-3 at 9.)  Similarly, in his deposition, Mr. Mathewson testified that Lt. Bushman-Weaver told him to destroy the fan, that he was not allowed to have it, that he did not have a permit for these things, and that he had to take it apart and destroy it.  He testified he tried to explain to Lt. Bushman-Weaver that the fan was not meant to come apart and if he took the fan

apart it would break everything and ruin the feathers.  He testified that Lt.

Bushman-Weaver responded, "Do it now, otherwise you're going in the hole and

I'll do it."  (Mathewson Depo. Vol. II at 193:17-25-194:1-9, Doc. 80 at 45.)

> Mr. Mathewson's cell mate described the incident as follows:
>
> Ms. Weaver the CO did a shake down on me and Robert Mathewson's
> cell brought us back up to the cell and she told Robert that the beaded
> handled on the feathers needed to be removed.  He let her know that it
> can't be removed because it is all one and he can not break the
> feather, she did not want to hear him out.  She said to take it off or
> you are going to the hole.  He asked for a higher rank to come down
> she would not let it happen.  Robert did not want to go to the hole or
> be written up.  So he had to take the handle off that destroyed the
> eagle feathers.  Very bad medicine for Robert, in the Native American
> ways.

(McElderry statement 7/8/18, Doc. 102 at 18.)

Lt. Bushman-Weaver testified that she told Mr. Mathewson "you can have

your feathers, that's your right, of course, have your feathers, you can have your

beads, you can have your dowel, but you cannot form them into a fan."

(Defendants' SUF at ¶ 74 citing Weaver Depo, Doc. 80, Ex. 1 at 36:18-23,

disputed.)

Mr. Mathewson testified that to dissemble he would have had to cut the

strings that held the beads, disengage the glue and beads and feathers and disrupt

the patterns that were so intricately arranged which would have destroyed the fan's

intended use and structure and form.  (Mathewson MSJ, Doc. 77 at 4.)

Based upon this evidence, the Court assumes for purposes of these findings

that Lt. Bushman-Weaver instructed Mr. Mathewson to disassemble his prayer fan,
he told her to do so would destroy the fan, and she responded that he had to
disassemble the fan or he would go to the hole with a major write-up.

It is undisputed that Mr. Mathewson then became upset and broke the prayer
fan over his knee and threw the handle at Lt. Bushman-Weaver.  He told her she
could keep the handle, but he was keeping the feathers.  (Defendants' SUF at ¶ 78,
undisputed.)  Crossroads staff confiscated the handle of Mr. Mathewson's prayer
fan after he broke the fan, but then later returned it to him on the condition that it
was to be sent out of the prison (as a completed hobby item).  (Defendants' SUF at
¶ 82, undisputed.)  After the cell search on September 28, 2017, Mr. Mathewson
kept his eagle feathers and the eagle feathers were never confiscated by any staff at
Crossroads.  (Defendants' SUF at ¶ 81, undisputed.)  He eventually burned the
feathers.  (Mathewson Depo. Vol. I at 20:23-25 – 21:1-6, Doc. 84-17 at 5-6.)

MSP Policy 4.1.3 is the Inmate Personal Property Policy ("Property Policy")
which governs inmate personal property at Crossroads and it prohibits inmates
from altering their property.  The purpose of MSP 4.1.3, is "to permit inmates to
possess only those items that do not disrupt the safe and orderly operation of the
facility or endanger the safety and security of the public, staff, or other inmates."
(Defendants' SUF at ¶ 39, undisputed.)  The Property Policy allows inmates who
subscribe to the Native American Religion to have one four-feather fan or four

single feathers "(plain; no beading or adornments)" in their property.  (Defendants'

SUF at ¶ 36.)  Mr. Mathewson disputes this fact and contends that Crossroads

routinely allows inmates to adorn their feathers as seen in the photo of Mr.

Bearcomesout's fan (Doc. 101 at ¶ 36; Doc. 84-4).  (Mathewson's Statement of

Disputed Facts, Doc. 101 (hereinafter "Mathewson SDF") at ¶ 42.)

        Pursuant to the MSP 5.5.4 Hobby Program Policy ("Hobby Policy"),

inmates at Crossroads are not allowed to have completed hobby items in their cells.

Inmates may have one hobby permit at a time, and inmates may order hobby items

from the hobby store for the permit they hold but they are required to keep receipts

for those purchases to prove ownership.  All the hobby items ordered must be kept

in one approved property container according to the policy, which is regularly

inspected during cell searches by Crossroads staff.  Crossroads staff may confirm

that inmates only have items in their approved property container that are related to

the hobby for which they have a permit, and that correspond to the receipts for

purchases from the hobby store.  Any item that is not covered by a receipt and a

permit may be confiscated as contraband.  Inmates are required to return or

otherwise dispose of all items covered by one hobby permit (e.g. leatherwork)

when they switch to a different kind of hobby permit (e.g. beading).  (Defendants'

SUF at ¶ 37, undisputed.)  All completed hobby items must be mailed out as gifts,

sent to the Hobby Store for sale, or delivered to a contract purchaser within one

week of their completion.  (Defendants' SUF at ¶ 47.)  Mr. Mathewson conceded at this deposition that once a hobby item is finished you cannot keep it in your cell, you must send it out.  (Defendants' SUF at ¶ 79, undisputed.)

These policies were created to counteract the constant threat in prison from inmates weaponizing personal property or hobby items (e.g. making a dowel into a "shank" used to defend against or defeat an inmate or staff), using them to covertly communicate (e.g. using beading or adornment to send a message or display Security Threat Group colors), using them to hide drugs or other contraband (e.g. creating a hobby item with a hidden compartment), or trading them as a means of currency (e.g. a completed hobby item in exchange for a favor).  (Defendants' SUF at ¶ 41, undisputed.)  Crossroads has had security incidents in the past where wooden dowels were made into "shank" weapons.  (Defendants' SUF at ¶ 45, undisputed.)

If an item is altered from its original state, regardless of whether or not it is a religious item, and it poses a security risk for the facility and Crossroads must do its due diligence to keep the inmates and staff safe inside the institution.  If the item poses a threat, the proper thing to do is to confiscate that item.  (Defendants' SUF at ¶ 48.)  Mr. Mathewson contends, however, that Lt. Bushman-Weaver was not threatened by Mr. Mathewson's prayer fan because she left it in his cell after discovering it.  (Mathewson SDF at ¶ 48.)

If an inmate uses a hobby item outside of the hobby permit to create an unauthorized item, that item creates a security threat. (Defendants' SUF at ¶ 49.) An item is altered from its original state is considered contraband. If the item can be returned to its original state, Crossroads staff would ask the inmate to remove the alterations so it would comply with policy and would no longer be considered contraband. If the item cannot be returned to its original state and is considered dangerous contraband, Crossroads staff would confiscate the item. (Defendants' SUF at ¶ 50.) Mr. Mathewson does not specifically dispute these statements but contends they are "too vague to address." (Mathewson SDF at ¶¶ 49, 50.)

Pursuant to Crossroads Policy No. 20-4, "Chaplaincy and Religious Services" ("Religion Policy") inmates may request religious clothing, symbols, and other items required for the practice of a particular faith by completing and submitting to the Chaplain a 20-4A Religious Article Authorization Request. (Religion Policy at ¶ F(1), Doc. 84-7 at 5; Defendants' SUF at ¶ 51.) Mr. Mathewson contends this procedure was enacted after the incident at issue and that he was not aware of this procedure. (Mathewson SDF at ¶ 51.)

## IV. SUMMARY JUDGMENT ANALYSIS

### A. RLUIPA

RLUIPA provides that "no government shall impose a substantial burden on

the religious exercise of a person residing in or confined to an institution" unless the government shows that the burden furthers "a compelling government interest" by "the least intrusive means" available.  42 U.S.C. § 2000cc-1(a).  But RLUIPA does not authorize money damages against state officials, regardless of whether they are sued in their official or individual capacities.  *See Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015); *see also Knows His Gun v. Montana*, 866 F.Supp.2d 1235 (D. Mont. 2012) ("CCA Defendants may fairly be said to be state or "government" actors under RLUIPA").  The only relief Mr. Mathewson may obtain under RLUIPA is injunctive relief.  He does not, however, seek injunctive relief in his Amended Complaint.  As such, Mr. Mathewson's claims under RLUIPA should be dismissed.

### B. First Amendment

The First Amendment prohibits the government from making a law prohibiting the free exercise of religion.  "The right to exercise religious practices and beliefs does not terminate at the prison door.  The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security."  *McElyea v. Babbit*, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam).  In asserting a free exercise claim, an inmate must first demonstrate that the "government action in question substantially burdens the person's practice of her religion."  *Jones*, 791 F.3d at

1031.  If there is a showing of a substantial burden the Court must analyze whether the prison restrictions were "reasonably related to legitimate penological interests" using the factors set forth in *Turner v. Safley*, 482 U.S. 78, 89-91 (1987).

"'[A] substantial burden must place more than an inconvenience on religious exercise'; it must have a 'tendency to coerce individuals into acting contrary to their religious beliefs' or 'exert[ ] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Ohno v. Yasuma*, 723 F.3d 984, 1011 (9th Cir. 2013) (*quoting Guru Nanak Sikh Soc'y of Yuba City v. Cnty. of Sutter*, 456 F.3d 978, 988 (9th Cir. 2006).  Mr. Mathewson contends that Lt. Bushman-Weaver's threat that he either dismantle his eagle prayer fan or go to solitary confinement substantially burdened his religious exercise and sincerely held religious beliefs.  (Mathewson MSJ Brief, Doc. 77 at 2.)  Mr. Mathewson has not specifically addressed in his Motion for Summary Judgment or in his responses to Defendants' Motions for Summary Judgment how Lt. Bushman-Weaver's instruction substantially burdened his religious practice.  There are, however, references in the record regarding the importance of the prayer fan to Mr. Mathewson's religious practice.  (Mathewson's Preliminary Pretrial Statement, Doc. 35 at 3; Amended Complaint, Doc. 48 at ¶ 10.)  Out of an abundance of caution, the Court will assume for purposes of this Order that the denial of a prayer fan would place a substantial burden on Mr. Mathewson's religious beliefs.  But

the issue is not whether Mr. Mathewson could have a prayer fan, the issue is whether the request that he bring his fan into compliance with prison policies was a substantial burden on his religious exercise.

Even assuming that Mr. Mathewson's destruction of his prayer fan because Lt. Bushman-Weaver told him to disassemble it was a substantial burden on the practice of his religion, there was no constitutional violation because Lt. Bushman-Weaver's order was based upon prison restrictions "reasonably related to legitimate penological interests." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (*citing Turner*, 482 U.S. at 89); *see also Jones*, 791 F.3d at 1032.

The *Turner* factors relevant to the inquiry of whether the restrictions are reasonably related to legitimate penological interests are:  (1) a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) the "absence of ready alternatives" and the "existence of obvious, easy alternatives." *Turner*, 482 U.S. at 89-91.

> **1.    Is there a valid, rational connection between the restrictions at issue and the proffered government interests put forward to justify the restrictions?**

Legitimate penological interests include "the preservation of internal order

16

and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of prisoners." *Procunier v. Martinez*, 416 U.S. 396, 412 (1974) (footnote omitted)(*overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989)).  "Prison authorities cannot rely on general or conclusory assertions to support their policies.  Rather, they must first identify the specific penological interests involved and then demonstrate both that those specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests." *Walker v. Sumner*, 917 F.2d 382, 386 (9th Cir. 1990); *see also Ashker v. Cal. Dep't of Corr.*, 350 F.3d 917, 922 (9th Cir. 2003); *Prison Legal News v. Cook*, 238 F.3d 1145, 1150 (9th Cir. 2001).

It is Lt. Bushman-Weaver's undisputed testimony that her issue with Mr. Mathewson's fan was that it was not in compliance with Crossroad's policies because he had beaded his feathers onto the dowel and made a fan.  He had made a completed hobby item which inmates are not allowed to keep in their cells. (Weaver Depo., Doc. 80 at 10, Depo page 32 at 10-13.)  Defendants specifically argue that Mr. Mathewson's prayer fan violated a number of policies.  First, they contend the fan violated the Property Policy because the eagle feathers had been altered.  Next, they contend the construction of the fan made it a completed hobby item, which Mr. Mathewson was not allowed to keep in his cell pursuant to the

Hobby Policy. (Defendants' SUF at ¶ 61, undisputed.) Mr. Mathewson understood that once a hobby item is finished you cannot keep it in your cell, you must send it out. (Defendants' SUF at ¶ 79, undisputed.) Third, Defendants contend Mr. Mathewson violated the Hobby Policy because he did not have a hobby permit on September 28, 2017 which would have allowed him to possess a wooden dowel of any size or shape. Mr. Mathewson never requested or was granted any special permissions to keep any hobby materials or a completed hobby item in his cell beyond standard policy. (Defendants' SUF at ¶ 64, undisputed.)

It is undisputed that these policies exists to counteract the constant threat in prison from inmates weaponizing personal property or hobby items (e.g. making a dowel into a "shank" used to defend against or defeat an inmate or staff), using them to covertly communicate (e.g. using beading or adornment to send a message or display Security Threat Group colors), using them to hide drugs or other contraband (e.g. creating a hobby item with a hidden compartment), or trading them as a means of currency (e.g. a completed hobby item in exchange for a favor). (Defendants' SUF at ¶ 41, undisputed.)

The Court finds this undisputed evidence to be sufficient to establish a valid, rational connection between the Hobby Policy and the Property Policy and the legitimate governmental interest of security in the prison. Mr. Mathewson argues that Lt. Bushman-Weaver's reliance on policy had no reasonable relationship to

18

any penological interest because she testified that she did not feel the fan posed a threat. (Mathewson's MSJ, Doc. 77 at 2 citing Weaver Deposition at 32:22-25; 33:1, 34:1-4.) But Lt. Bushman-Weaver also testified that "any items that have been altered is a security issue, because our staff can identify what they're allowed to have. When the inmates start making, and they're crafty, when they start making additional things, it does become a security risk. Did I feel that that item was particularly dangerous, no." (Weaver Depo. at 42:14-20, Doc. 80 at 13.) The issue is not whether Mr. Mathewson's particular prayer fan was inherently dangerous. The issue is whether there was a valid, rational connection between the property and hobby policies and a legitimate governmental interest.

Given these undisputed safety concerns, the Court finds there was a rational connection between these policies and legitimate governmental interests. This factor favors Defendants.

### 2. Did alternative means of exercising the rights remain open to Mr. Mathewson?

Under this factor, "[t]he relevant inquiry . . . is not whether the inmate has an alternative means of engaging in the particular religious practice that he or she claims is being affected; rather, [the court must] determine whether the inmates have been denied all means of religious expression." *Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993) (*citing O'Lone*, 482 U.S. at 351–52); *see also Mayweathers v. Newland*, 258 F.3d 930, 938 (9th Cir. 2001).

Defendants argue there are alternative avenues for Mr. Mathewson to exercise his religious rights by (1) maintaining a drop fan" which complied with prison policy or (2) submitting a religious accommodation request to the Chaplain to use a fixed fan.  The Court agrees with Defendants.

### a.  Drop Fan

Mr. Mathewson testified that there are two options for constructing a prayer fan.  One is a "drop fan" where each feather is individually beaded and wrapped in a leather loop so that the leather loop can be placed with string or more leather.  The four feathers are then held by twisting the leather tight into a fan to hold it.  (Mathewson Depo, Vol. I at 54:4-11, Doc. 84-17at 14.)  Mr. Mathewson, however, chose to construct a "fixed" prayer fan where there is a handle attached to the feathers.  (Mathewson Depo Vol. 1 at 43-44, Doc. 84-17 at 11.)  Accordingly, he does not dispute that there was another option available to him to have a prayer fan which would have been in compliance with prison policy.

Because Mr. Mathewson attached a handle to his feather, it is undisputed that Mr. Mathewson's fan was a completed hobby item that he was not allowed to keep in his cell.  (Defendants' SUF at 61, undisputed.)  Mr. Mathewson took materials he obtained through hobby and instead of using them for proper hobby purposes, he created a religious item which he intended to keep in his cell.  It is undisputed that Mr. Mathewson knew that he was not allowed to maintain

completed hobby projects in his cell.  (Defendants' SUF at 79, undisputed.)  It is

undisputed that Lt. Bushman-Weaver told Mr. Mathewson he had to disassemble

the prayer fan even though Mr. Mathewson told her this would destroy the fan.

(September 28, 2017 Informal Resolution Form, Doc. 84-15 at 2.)  But it is also

undisputed that Mr. Mathewson got irritated with Lt. Bushman-Weaver's

instruction, and instead of attempting to carefully remove the feather, he broke his

fan over his knee and threw the handle at Lt. Bushman-Weaver.  (Defendants' SUF

at 78, undisputed.)  The Court finds, therefore, that Mr. Mathewson had an

alternative means of exercising his religion by maintaining a drop fan that was in

compliance with prison policies and/or by attempting to carefully remove his

feathers from the wooden handle.

### b.  Request for Accommodation

As set forth above, the Religion Policy allows inmates to make special

requests for religious items required for the practice of their faith by completing

and submitting to the Chaplain a Religious Article Authorization Request.

Defendants also produce a copy of the Religious Accommodation Request Form

(Doc. 84-22) which Mr. Mathewson could have utilized to request an

accommodation for his prayer fan.  Defendants assert that Mr. Mathewson was

familiar with this form and that he had never filled one out to request that he be

able to build a prayer fan that would otherwise violate policy.  (Defendants' SUF at

21

¶ 51.)  Mr. Mathewson contends that this procedure was enacted after the incident at issue and he was not aware of the procedure.  (Mathewson SDF at ¶ 51.)  But the documents presented by Defendants clearly establish that the policy at issue became effective June 20, 2016 (Doc. 84-7 at 1) and the form was effective January 4, 2017 (Doc. 84-22) prior to the September 28, 2017 incident involving Mr. Mathewson's prayer fan.  Thus, Mr. Mathewson, at all times, had an alternative means of obtaining additional religious items by asking for authorization from the Chaplain prior to the creation of his prayer fan.

The Court finds that several alternative means of exercising his rights were open to Mr. Mathewson including (1) he could have created a drop fan as opposed to a fixed fan; (2) he could use his feathers without a fan; (3) he could have attempted to more carefully remove his feathers from the handle; (4) if he broke his feathers he could have applied for replacement eagle feathers; and/or he could have sought a religious accommodation for his fixed fan.  Instead, Mr. Mathewson chose to use hobby items to create a religious item that was in violated of a valid prison policy and he did not try to get permission to have the fan in his cell. Consequently, the second *Turner* factor weighs in Defendants' favor.

### 3. What impact would allowing prayer fan have on guards and other inmates, and on the allocation of prison resources?

Under the third prong of the *Turner* test the Court must consider the impact

the accommodation would have on guards and other inmates and on the allocation of prison resources generally.  Defendants contend the third *Turner* factor weighs in their favor because allowing Mr. Mathewson to maintain his prayer fan as construed would complicate staff regulation of inmates' personal property since different inmate populations would be afforded differing accommodations.  They contend it would increase safety risks to inmates, staff, and the public if certain inmates were allowed to possess dangerous items that others in the prison cannot. (Crossroads' MSJ Brief, Doc. 87 at 22.)  Defendants submitted only argument and no evidence in support of these contentions, but Lt. Bushman-Weaver testified that the policies allow staff to identify what items inmates are allowed to have.  If inmates are allowed to alter items, it becomes a security issue because staff cannot readily identify those items.  (Weaver Depo at 42:14-20, Doc. 80 at 13.) Defendant Madrid also testified that allowing inmates to use hobby items to adorn a religious items creates a security issue because it makes it an altered item which raises a number of potential security risks in that it could be a gang designation or it could be used to barter or trade with other inmates.  (Madrid Depo, 38:3-8, 57:6-21, Doc. 84-18 at 11, 16.)

The Court finds that allowing inmates to alter hobby items even to create religious items effects the guards and the manner they maintain security making it more difficult to identify allowable items, curbing gang issues in the prison, and

curbing the bartering and trading of items between inmates.  The third prong of the

*Turner* analysis favors Defendants.

> **4.    Is the absence of ready alternatives evidence of the
> reasonableness of the prohibition on Mr.   Mathewson's
> prayer fan or are there obvious alternatives that evidence
> an exaggerated response?**

Finally, the fourth *Turner* factor requires the Court to consider whether there

are ready alternatives to the prison's current policy that would have accommodated

Mr. Mathewson at a de minimus cost to the prison.  The "existence of obvious,

easy alternatives may be evidence that the regulation is not reasonable, but is an

'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 90.  Prison

officials do not bear the burden of disproving the availability of alternatives.  *See*

*O'Lone*, 482 U.S. at 350.

Given the above analysis, the Court finds that this factor also favors

Defendants.  Mr. Mathewson provides no evidence of obvious alternative policies

which would easily address the security concerns at issue or that the prohibition of

altered property and hobby items from being maintained in a cell was an

exaggerated response to the problem.

Mr. Mathewson altered his feathers using hobby items to create his prayer

fan which was not permitted by prison policy.  When Lt. Bushman-Weaver

requested he dissemble the fan to bring it into compliance with prison policy, Mr.

Mathewson chose to break his fan over his knee instead of trying to carefully

24

dissemble it. The Court finds the Prison's policies were reasonably related to legitimate penological purposes, there were numerous alternative available to Mr. Mathewson, and no obvious alternatives to the prison's rules.

Defendants have met their burden of demonstrating a lack of genuine issues of material fact and their motions for summary judgment on Mr. Mathewson's First Amendment claims should be granted and Mr. Mathewson's motion for partial summary judgment on this issue should be denied.

## C. Fourteenth Amendment

### 1. Equal Protection

"The Equal Protection Clause requires the State to treat all similarly situated people equally." *Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir. 2008)(citation omitted). "To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998); *Lee v. City of L.A.*, 250 F.3d 668, 686 (9th Cir. 2001); *see also Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Mr. Mathewson alleges the actions of Lt. Bushman-Weaver violated the Fourteenth Amendment Equal Protection Clause in that as an enrolled member of the Potawatomi Nation he is a member of a protected class, her actions and words

constituted intentional discrimination against him, and she did not afford him a reasonable opportunity to pursue his faith as she did other faiths.  (Mathewson MSJ, Doc. 77 at 2-3.)   He did not, however, present any evidence that he was discriminated against based upon his race or religion.  Lt. Bushman-Weaver insisted that Mr. Mathewson comply with valid prison policies regarding hobby and property items.  There is no showing that these policies were applied differently to other inmates within the prison.  Mr. Mathewson's Equal Protection claim brought under the Fourteenth Amendment to the United States Constitution should be dismissed.

### 2.  Procedural Due Process

The Due Process Clause protects prisoners from being deprived of property without due process of law.  *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). Prisoners have a protected interest in their personal property.  *Hansen v. May*, 502 F.2d 728, 730 (9th Cir. 1974).  Although prisons often ban or limit inmates' possession of certain types of personal property, a property interest that has been recognized and protected by state law may be protected under the Due Process Clause of the Fourteenth Amendment.  *See Paul v. Davis*, 424 U.S. 693, 710 (1976); *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Inmates who have been afforded the opportunity to possess personal property pursuant to a state law or regulation accordingly may claim that prison officials

26

confiscated or destroyed their property without due process.  *Nevada Dept. of Corrections v. Greene*, 648 F.3d 1014, 1019 (9th Cir. 2011).

The Due Process Clause requires notice and an opportunity for some kind of hearing prior to the deprivation of a significant property interest.  *See Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 19 (1978).  Where the deprivation is not random and unauthorized, but the result of "established state procedure," the Fourteenth Amendment requires "an opportunity . . . granted at a meaningful time and in a meaningful manner, . . . for a hearing appropriate to the nature of the case."  *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435-37 (1982) (internal quotations and citation omitted).

Mr. Mathewson alleges Defendants did not afford him any process before demanding that he destroy his eagle fan and no meaningful post-deprivation remedy for the loss of his eagle feathers thus depriving him of his protected property interest without due process.  (Mathewson MSJ, Doc. 77 at 3.)  But no one took or destroyed Mr. Mathewson's property except him.  The instruction to remove the feathers from the handle was done pursuant to an established state procedure and Lt. Bushman-Weaver simply requested that Mr. Mathewson comply with prison policy by dissembling his prayer fan.  She provided him the option of receiving due process but to do that she would have had to have given him a write-up.  Mr. Mathewson chose to not take advantage of that process and destroyed his

property on his own.

There is no basis for a Fourteenth Amendment procedural due process claim under these facts.

### D.  State Constitutional Claims

#### 1.  Free Exercise Claim under the Montana Constitution

Montana's Constitution provides that "[t]he state shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." MONT. CONST. art. II, § 5.  The Montana Supreme Court has recognized that, although the right to religious freedom does not terminate at the prison door, "free exercise rights necessarily are restricted by the fact of incarceration."  *Cape v. Crossroads Correctional Center*, 2004 MT 265, ¶ 28, 323 Mont. 140, 99 P.3d 171. Under Montana's Free Exercise Clause, "[a]ll that is required is that prisoners be given a reasonable opportunity to exercise their religious freedom and practice their religion."  *Id*.  In addition, the Montana Supreme Court has held that "[p]rison officials are accorded wide ranging deference in implementing policies to preserve order and discipline among inmates."  *Quigg v. Slaughter*, 2007 MT 76, ¶ 19, 336 Mont. 474, 154 P.3d 1217 (*citing Jellison v. Mahoney*, 1999 MT 217, ¶ 12, 295 Mont. 540, 986 P.2d 1089).

For the reasons set forth above regarding Mr. Mathewson's First Amendment claims under the United States Constitution, Defendants

afforded Mr. Mathewson a reasonable opportunity to practice his religion.

Defendants provided reasonable accommodations and opportunity for Mr.

Mathewson to exercise his religion, therefore Defendants are entitled to summary

judgment on this claim.

### 2.  Equal Protection under the Montana Constitution

The Equal Protection Clause of the Montana Constitution provides:

> The dignity of the human being is inviolable.  No person shall be
> denied the equal protection of the laws.  Neither the state nor any
> person, firm, corporation, or institution shall discriminate against any
> person in the exercise of his civil or political rights on account of race,
> color, sex, culture, social origin or condition, or political or religious
> ideas.

MONT. CONST. art. II, § 4.  The Montana Supreme Court has held that a lower

standard is applied to prison regulations that implicate fundamental rights of

prisoners, including religious freedom.  *McDermott v. Montana Dep't of*

*Corrections*, 2001 MT 134, ¶ 31, 305 Mont. 462, 29 P.3d 992.  In such cases, the

court must determine whether the State action is reasonably related to a legitimate

penological interest.  *Id*.

As set forth above, Mr. Mathewson presented no evidence that he was

treated differently from other inmates based on his race or religion.  In addition,

Defendants have shown that the policies at issue were reasonably related to a

legitimate penological purpose.  Defendants did not violate Mr. Mathewson's right

to equal protection.

29

### 3. Procedural Due Process under the Montana Constitution

Montana's Constitution provides that "[n]o person shall be deprived of life, liberty, or property without due process of law."  MONT. CONST. art. II, § 17. Montana's Due Process Clause requires (1) notice, and (2) opportunity for a hearing appropriate to the nature of the case.  *Montanans for Justice v. State ex rel. McGrath*, 2006 MT 277, ¶ 30, 334 Mont. 237, 146 P.3d 759.

As set forth above, Mr. Mathewson was not deprived a property interest without procedural due process because he destroyed his own property after being offered an opportunity for procedural due process.  This claim should be dismissed.

## V.  CONCLUSION

Defendants have established that the instruction to dissemble his prayer fan was based upon valid policies which did not allow inmates to maintain completed hobby items or altered property in their cells.  Mr. Mathewson's prayer fan constituted an altered property item and a hobby item because he attached his eagle feathers to a beaded wooden dowel which could be a potential security risk. Defendants were justified in telling Mr. Mathewson to disassemble the fan.  The resulting destruction of the fan was done by Mr. Mathewson himself.  It was not a violation of the First Amendment or the Fourteenth Amendment and as such Mr. Mathewson's Motion for Partial Summary Judgment should be denied,

Defendants' Motions for Summary Judgment should be granted, and this matter should be dismissed.

Based upon the foregoing, the Court issues the following:

## ORDER

Mr. Mathewson's Motion to Stay (Doc. 89) as construed as a motion to strike Mr. Bearcomesout's affidavit is DENIED AS MOOT.

Further, the Court issues the following:

## RECOMMENDATIONS

1.  Mr. Mathewson's Motion for Partial Summary Judgment (Doc. 76) should be DENIED.

2.  Defendant Alstead's Motion for Summary Judgment (Doc. 82) should be GRANTED.

3.  The Core Civic Defendants' Motion for Summary Judgment (Doc. 86) should be GRANTED.

4.  The Clerk of Court should be directed to close this matter and enter judgment in favor of Defendants pursuant to Rule 58 of the Federal Rules of Civil Procedure.

5.  The Clerk of Court should be directed to have the docket reflect that the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate Procedure that any appeal of this decision would not be taken in good faith.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations within fourteen days after service (mailing) hereof.[2]  28 U.S.C. § 636.  Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

This order is not immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Fed.R.App.P. 4(a), should not be filed until entry of the District Court's final judgment.

DATED this 13th day of May, 2020.


 */s/ John Johnston*
John Johnston
United States Magistrate Judge

---

[2]Mr. Mathewson is entitled an additional three (3) days after the period would otherwise expire.